T.C. Memo. 2014-108

UNITED STATES TAX COURT

GUY M. DABNEY AND ANN V. DABNEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14566-12.                        Filed June 5, 2014.

Guy M. Dabney and Ann V. Dabney, pro sese.

<u>Heather K. McCluskey</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of $42,431 in

petitioners' Federal income tax for 2009 and an accuracy-related penalty of

$8,486.[1]  The issues for decision are:  (1) whether a March 2009 withdrawal of

_____

[1] Mrs. Dabney did not appear at trial.  At trial Mr. Dabney stated to the

(continued...)

[*2] $114,000 from Mr. Dabney's IRA was a taxable distribution, (2) if so, whether Mr. Dabney is liable for the 10% additional tax on the distribution under section 72(t), and (3) whether he is liable for an accuracy-related penalty under section 6662(a) for 2009.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Mr. Dabney resided in California at the time he filed the petition.

In 2008 Mr. Dabney rolled over funds from an individual retirement account (IRA) at Northwest Mutual into a preexisting self-directed IRA he had with Charles Schwab & Co., Inc. (Charles Schwab). Sometime thereafter he learned of

---

[1] (...continued)
Court that Mrs. Dabney had agreed to "abide by whatever" result the Court reached as to him. In an oral motion and in a subsequent written motion respondent moved to dismiss Mrs. Dabney for lack of prosecution and to find her "liable for a deficiency in tax and penalty consistent with the opinion * * * [the Court] issues in this case." Petitioners have not objected to respondent's motion, and we will grant the motion to dismiss Mrs. Dabney; the decision entered as to her will reflect the resolution of the issues decided in this case.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] a piece of undeveloped land in Brian Head, Utah (Brian Head property), that was for sale, and which he believed was priced below its fair market value.

Mr. Dabney conducted some Internet research and came to the conclusion that IRAs are permitted to hold real property for investment. He then set out to have his Charles Schwab IRA purchase the Brian Head property.

Before purchasing the Brian Head property Mr. Dabney called Charles Schwab's customer service line. He did not have a dedicated customer service representative at Charles Schwab but instead spoke with whichever customer service representative happened to answer his call. During his telephone call a customer service representative informed Mr. Dabney that Charles Schwab did not allow alternative investments, which would include the purchase and holding of real property.

Mr. Dabney also made several telephone calls to Vincente Alvarez before purchasing the Brian Head property. Mr. Alvarez is a certified public accountant at the firm Breard & Associates, petitioners' accountants at that time. Mr. Alvarez told Mr. Dabney that he did not have any training in retirement accounts and was not certain whether it would be possible to purchase or hold real property with an IRA. After Mr. Dabney shared the results of his Internet research with Mr.

**[*4]** Alvarez, however, Mr. Alvarez agreed with Mr. Dabney that it would be possible for his Charles Schwab IRA to purchase the Brian Head property.

On the basis of his telephone conversations with the Charles Schwab customer service representative and Mr. Alvarez, as well as his own research, Mr. Dabney arranged what he believed to be a viable way to have his Charles Schwab IRA purchase the Brian Head property, even though Charles Schwab did not allow alternative investments. His plan was to have funds wired directly from the IRA to the seller of the Brian Head property and to have title to the property placed in the name of "Guy M. Dabney Charles Schwab & Co. Inc Cust. IRA Contributory". He planned to then resell the property for a small gain and to contribute the proceeds of the sale back into the IRA. Mr. Dabney believed that the property would not need to be managed by a trustee as long as he did not use or enjoy the property.

On February 6, 2009, Mr. Dabney signed a contract to purchase the Brian Head property. A month later he initiated a withdrawal of $114,000 from his IRA (withdrawal) by filling out a distribution request form provided by Charles Schwab. He checked the box indicating that the withdrawal was an "Early Distribution, no known exception (Code 1)", which refers to a distribution that occurs before an account holder reaches the age of 59-1/2 where none of the

[*5] exceptions under section 72(t) applies. Mr. Dabney was under 59-1/2 years of age during 2009. Despite checking this box, Mr. Dabney believed that the withdrawal would not actually be considered an early distribution. The distribution request form did not indicate that the requested funds were to be used to invest in property on behalf of the Charles Schwab IRA.

Charles Schwab wired $114,000 directly to the bank account of Chicago Title Insurance Co., Service Link Division (Chicago Title), the company handling the sale of the Brian Head property. Mr. Dabney directed Chicago Title to name "Guy M. Dabney Charles Schwab & Co. Inc Cust. IRA Contributory" as the owner of the Brian Head property. However, because of a bookkeeping error by Chicago Title, title to the property was placed in Mr. Dabney's own name.

Although he had hoped to sell the Brian Head property sooner, Mr. Dabney was unable to find a buyer until 2011. It was then that Mr. Dabney discovered that the property was incorrectly titled in his own name. Upon discovering the bookkeeping error, Mr. Dabney promptly sought and received a scrivener's affidavit from Chicago Title in which the company admitted fault for the error. Mr. Dabney sold the Brian's Head property and received $127,226 on the sale, after taxes and fees. That amount was wired directly into the Charles Schwab IRA

**[\*6]** on or around January 28, 2011. Mr. Dabney marked the deposit as a rollover contribution, and Charles Schwab accepted the deposit as such.

Tax Return Preparation

Breard & Associates prepared petitioners' Form 1040, U.S. Individual Income Tax Return, for 2009. Charles Schwab issued Mr. Dabney a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., for 2009, although Mr. Dabney does not recall ever receiving it. The Form 1099-R stated that he had received a $114,000 early distribution from his Charles Schwab IRA and that no exceptions to the early distribution penalty applied. Petitioners did not report the withdrawal on their Form 1040.

OPINION

I.  Burden of Proof

Mr. Dabney has neither claimed nor shown that he satisfied the requirements of section 7491(a) to shift the burden of proof to respondent with regard to any factual issue. Accordingly, Mr. Dabney bears the burden of proof. See Rule 142(a).

[*7] II.     IRA Distribution Includible in Gross Income

Generally, amounts distributed from an IRA are includible in a taxpayer's gross income as provided in section 72.  Sec. 408(d)(1).  Mr. Dabney argues that the $114,000 withdrawal from his Charles Schwab IRA was not a taxable distribution because the withdrawal was either:  (1) a purchase made by the IRA or (2) a transfer between IRA trustees.  Respondent argues that Mr. Dabney's Charles Schwab IRA did not purchase the Brian Head property because Charles Schwab's policies do not permit the purchase or holding of real property and that a trustee-to-trustee transfer did not occur.  We agree with respondent.

A.     The IRA Did Not Purchase the Brian Head Property.

Mr. Dabney argues that he acted as a conduit through which his Charles Schwab IRA purchased the Brian Head property.  Under this theory it was the IRA that purchased the property, and the $114,000 withdrawal was not a distribution.

In Ancira v. Commissioner, 119 T.C. 135, 136 (2002), a taxpayer maintained a self-directed IRA.  In order to direct funds from the IRA to be invested in specific assets, the taxpayer made requests by telephone to the IRA's investment adviser.  Id.  The custodian then executed the requests.  Id.  During the year in issue the taxpayer requested that his IRA purchase a particular company's (issuing company) stock.  Id.  The investment adviser informed the taxpayer that,

[*8] while the issuing company's stock could be held as an asset of the IRA, the custodian would not purchase the stock because the stock was not publicly traded. Id. Subsequently, the investment adviser determined that the IRA could invest in the issuing company's stock if the custodian issued a check payable to the issuing company and the taxpayer delivered the check to the issuing company. Id.

The taxpayer used a "Distribution Request Form" to request a check made payable to the issuing company, and the custodian sent the taxpayer the requested check. Id. at 136. The taxpayer forwarded the check to the issuing company, and the issuing company issued a stock certificate which stated that the IRA was the owner of several hundred shares of the issuing company's stock. Id. at 136-137. The taxpayer believed that the issuing company would send the stock certificate to the custodian of the IRA. Id. at 137. For unknown reasons, the stock certificate was not delivered to the custodian, but the taxpayer did not discover this error until after receiving a notice of deficiency from the Internal Revenue Service. Id. After discovering the error, the taxpayer directed the issuing company to send the stock certificate to him. Id. Upon receipt of the stock certificate the taxpayer delivered the certificate directly to the custodian. Id.

We found that a distribution did not occur when the custodian delivered the check to the taxpayer. We noted that there would not have been a distribution if

[*9] the custodian had either purchased stock directly from the issuing company or sent a check to a broker who then purchased the stock for the IRA. Ancira v. Commissioner, 119 T.C. at 137-138. Because the taxpayer had arranged the purchase, the taxpayer was not in constructive receipt of the check, and ownership of the stock was directly assumed by the IRA, we found that the taxpayer had acted as an agent for the custodian. Id. at 138. Moreover, we determined that the delay in delivery of the stock certificate to the custodian was a bookkeeping error, which "did not alter the ownership of the stock by the IRA and certainly did not transfer the ownership to * * * [the taxpayer]". Id. at 140.

Mr. Dabney argues that the facts of his case are similar to those in Ancira and that a distribution did not occur in this case for similar reasons. He argues that Charles Schwab does not permit its IRAs to invest in real property as a matter of policy and not because of any statutory prohibition. Consequently, Mr. Dabney contends that if title to the Brian Head property had been placed in the name of "Guy M. Dabney Charles Schwab & Co. Inc Cust. IRA Contributory", as intended, the purchase would have been virtually indistinguishable from that in Ancira. Respondent argues that, even disregarding any typographical errors, Charles Schwab's policy in itself distinguishes this case from the facts in Ancira. We agree with respondent.

**[\*10]**  Mr. Dabney is correct that IRAs are, as a statutory matter, permitted to hold real property.  See sec. 408(a)(3), (e)(5), (m) (prohibiting IRAs from investing in life insurance contracts, certain endowment contracts, and collectibles); see also H.R. Rept. No. 93-779, at 131 (1974), 1974-3 C.B. 244, 374 ("The balance in an individual retirement account generally may be invested in any assets that are acceptable investments for a qualified plan.").  However, we are not aware of any provision in the Code that requires an IRA trustee or custodian to give the owner of a self-directed IRA the option to invest IRA funds in any asset that is not prohibited by statute.

Section 408(a) requires that an IRA be a trust created and governed by a written instrument that meets various requirements.  Sec. 408(a)(1)-(6); see also Cobb v. Commissioner, 77 T.C. 1096, 1099 (1981), aff'd without published opinion, 680 F.2d 1388 (5th Cir. 1982).  Furthermore, a custodial account may be treated as a trust for purposes of qualifying as an IRA under section 408(a) if the account otherwise meets the requirements laid out in that subsection.  Sec. 408(h).  When, under section 408(h), a custodial account is treated as a trust, the custodian is treated as a trustee.  Id.

A trustee administering a trust typically has broad powers that are only "limited by statute or the terms of the trust".  3 Restatement, Trusts 3d, sec. 85

[*11] (2007); see also Cal. Prob. Code sec. 16200 (West 2011) ("A trustee has the following powers * * *: (a) The powers conferred by the trust instrument. (b) Except as limited in the trust instrument, the powers conferred by statute. (c) Except as limited in the trust instrument, the power to perform any act that a trustee would perform for the purposes of the trust[.]"). Thus, IRA trustees and custodians generally have broad latitude to direct or limit the investment of funds in an IRA.

At trial respondent called as a witness Elissa Withers, Operations Manager of Charles Schwab's San Diego branch. Ms. Withers testified that Charles Schwab's policies do not permit IRAs maintained by Charles Schwab to hold real property. Mr. Dabney has not introduced any evidence to show that these policies violate any statutory provision or the terms of the Charles Schwab IRA's trust instrument.[3] We find that, in its role as an IRA trustee, Charles Schwab had the power to prohibit the purchase and holding of real property and that Mr. Dabney's Charles Schwab IRA was not capable of holding real property.

Therefore, even if the Brian Head property had been titled as intended, the Charles Schwab IRA could not hold real property and would not have accepted

---

[3] A copy of the Charles Schwab IRA's trust instrument was not introduced into the record.

[*12] ownership of the Brian Head property. Consequently, we find that Mr. Dabney did not act as an agent on behalf of Charles Schwab and that the Charles Schwab IRA did not purchase the Brian Head property.

B.    The Withdrawal Was Not a Trustee-to-Trustee Transfer.

Section 408(d)(3) provides that a distribution is not includible in gross income if the entire amount of the distribution an individual receives is paid into an IRA or other eligible retirement plan within 60 days of the distribution. See Schoof v. Commissioner, 110 T.C. 1, 7 (1998). This recontribution is known as a "rollover contribution". Sec. 408(d)(3). Only one rollover contribution is permitted within a one-year period. Sec. 408(d)(3)(B); see also Bobrow v. Commissioner, T.C. Memo. 2014-21, at *12. As an alternative to a rollover contribution (and the one-year waiting period), the owner of an IRA may direct the IRA trustee to transfer funds directly to the trustee of another IRA. Rev. Rul. 78-406, 1978-2 C.B. 157. Because the funds are never paid or distributed to the IRA participant, no rollover contribution or taxable distribution occurs in a direct transfer between trustees. Id.; see also Bobrow v. Commissioner, T.C. Memo. 2014-21, at *13 n.5.

Mr. Dabney's goal was to increase the value of his IRA by investing in real property using funds from the IRA. The flaw was not in Mr. Dabney's intent but

[*13] in his execution.[4] Had Mr. Dabney initiated a rollover or a trustee-to-trustee transfer of funds from his Charles Schwab IRA to a different IRA--one permitted to purchase and hold real property--he would have achieved his goal without any unintended tax consequences. Instead Mr. Dabney directed Charles Schwab to wire the funds from his IRA directly to Chicago Title, the company handling the sale of the property. Mr. Dabney did not have an IRA (or other eligible retirement plan) with Chicago Title, and there is no evidence to suggest that Chicago Title is an IRA trustee. Thus, the transfer of funds to Chicago Title was not a transfer between IRA trustees. We conclude, therefore, that the $114,000 withdrawal was a taxable distribution made to Mr. Dabney and is includible in Mr. Dabney's gross income.[5]

---

[4] It is well settled that a taxpayer's expectations and hopes as to the tax treatment of his conduct in themselves are not determinative, Commissioner v. Duberstein, 363 U.S. 278, 286 (1960), and that matters of taxation must be determined in the light of what was actually done rather than the declared purpose of the participants, Weiss v. Stearn, 265 U.S. 242, 254 (1924).

[5] The withdrawal of funds also does not qualify as a step in a valid rollover contribution. The funds were not placed back into an IRA until nearly two years later, well after the 60-day requirement. See sec. 408(d)(3). Although sec. 408(d)(3)(I) authorizes the Secretary to waive the 60-day requirement under certain circumstances, Mr. Dabney did not request such a waiver from the Secretary.

**[\*14]** III.     Section 72(t) Tax

Generally, a distribution from an IRA is includible in the distributee's gross income in the year of the distribution. See secs. 72(a), 408(d)(1). Distributions made before the taxpayer's attaining the age of 59-1/2 that are includible in income are generally subject to a 10% additional tax unless an exception applies. See sec. 72(t)(1), (2)(A)(i). Mr. Dabney was under 59-1/2 years of age in 2009, and there is no evidence that any of the statutory exceptions applies. See sec. 72(t)(2). Accordingly, the distribution is subject to the 10% additional tax under section 72(t).

IV.     Accuracy-Related Penalty

Pursuant to section 6662(a) and (b)(1) and (2), a taxpayer may be liable for a penalty of 20% of the portion of an underpayment of tax due to: (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. "Negligence" is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code; this includes a failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" means any careless, reckless, or intentional disregard. Sec. 6662(c). "Understatement" means the excess of the amount of the tax required to be shown on the return over the amount of the tax

**[*15]** imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). A "substantial understatement" of income tax is defined as an understatement of tax that exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000. Sec. 6662(d)(1)(A).

The Commissioner bears the initial burden of production. Sec. 7491(c). If the Commissioner satisfies his burden, the taxpayer then bears the ultimate burden of persuasion. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). The notice of deficiency indicates that Mr. Dabney should have reported a total tax of $58,315 but reported only $16,109 resulting in a $42,206 understatement. This understatement exceeds both $5,000 and 10% of the tax required to be shown on his return. See sec. 6662(d)(1)(A). Therefore, respondent has discharged his burden of production under section 7491(c).

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer shows that he or she acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448. We find that Mr. Dabney had reasonable cause and acted in good faith within the meaning of section 6664(c)(1).

Mr. Dabney is not a sophisticated taxpayer, and he has no background in tax or accounting. Although he was ultimately unsuccessful, Mr. Dabney went to

[*16] great lengths in attempting to ensure that the purchase of the Brian's Head

property using funds from his IRA would qualify as a nontaxable event. He

performed independent research on the Internet to confirm, correctly, that IRAs

are generally permitted to hold real property, and he spoke with a Charles Schwab

customer service representative and his accountant, Mr. Alvarez, on multiple

occasions regarding the purchase.

Mr. Dabney honestly believed that the purchase was appropriate, even going

to the trouble of obtaining a scrivener's affidavit when he discovered that the

property had been titled in the wrong name. He ensured that the funds were wired

directly from the Charles Schwab IRA to Chicago Title when he first purchased

the Brian's Head property and directly back into the IRA after he had sold the

property. Furthermore, the property was undeveloped, and Mr. Dabney ensured

that it was being held solely for investment purposes.[6]

Although he was mistaken in his understanding of the law, it was reasonable

under the circumstances for Mr. Dabney to believe that he had not received an

---

[6] Mr. Dabney seems to have gone to particular lengths to ensure that the purchase of the Brian Head property was not a prohibited transaction under sec. 408(e)(2)(A) and testified at trial that he had not derived any enjoyment from the land. See sec. 4975(c)(1)(D) (defining the term "prohibited transaction" to include "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan").

**[*17]** early distribution from his IRA.  <u>See</u> sec. 1.6664-4(b)(1), Income Tax Regs. (stating that an honest mistake of law may indicate reasonable cause and good faith).  We find that he had reasonable cause for failing to report the distribution on his return and acted in good faith.  Accordingly, we hold that Mr. Dabney is not liable for the accuracy-related penalty.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.  To reflect the foregoing,

<u>An appropriate order of dismissal</u>

<u>and decision will be entered</u>.