148 T.C. No. 14

UNITED STATES TAX COURT

JOHN C. TRIMMER AND SUSAN TRIMMER, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27238-14.                          Filed April 20, 2017.

While suffering from major depressive disorder after retiring
from the NYPD in 2011, H received two distributions from his
retirement accounts but did not roll them over into another qualified
retirement account within the requisite 60-day period of I.R.C. sec.
402(c)(3)(A).  When Ps' tax return preparer pointed out the problem
some months later, H rolled the funds over into an IRA.  Ps never
used any of the funds.  On their 2011 return Ps reported the two
distributions as nontaxable.  During R's examination of Ps' 2011 tax
return, Ps requested a hardship waiver from the 60-day rollover
requirement.  R denied the request and determined a deficiency in Ps'
2011 tax.

R contends that R's Examination Division lacked the authority
to consider a hardship waiver under I.R.C. sec. 402(c)(3)(B) and that
in any event R's exercise of discretion in denying a hardship waiver is
not subject to judicial review.

<u>Held</u>:  R's Examination Division had the authority to consider
Ps' request for a hardship waiver under I.R.C. sec. 402(c)(3)(B).  <u>See</u>

Rev. Proc. 2003-16, 2003-1 C.B. 359, as modified retrospectively by Rev. Proc. 2016-47, 2016-37 I.R.B. 346.

Held, further, the Tax Court has jurisdiction in this deficiency proceeding to review R's denial of Ps' request for a waiver of the 60-day rollover requirement.

Held, further, R's objections to Ps' proffered expert testimony are overruled; the expert testimony will be admitted into evidence.

Held, further, in the facts and circumstances of this case, it would be "against equity or good conscience", within the meaning of I.R.C. sec. 402(c)(3)(B), to deny Ps' request for a hardship waiver; the two distributions are excluded from Ps' 2011 gross income.

Held, further, R's imposition of the I.R.C. sec. 72(t) additional tax on early distributions is not sustained.

Held, further, R's determination that Ps failed to report $40 of taxable dividend income is sustained.

Elizabeth Ann Maresca, Amanda Katlowitz (student), Ravi Patel (student), and Regina Yoon (student), for petitioners.

Marissa J. Savit and Lyle B. Press, for respondent.

THORNTON, Judge:   The Internal Revenue Service (IRS) determined a $37,918 deficiency in petitioners' 2011 Federal income tax.  The issues for decision are:  (1) whether petitioners should receive a hardship waiver under

section 402(c)(3)(B) with respect to pension distributions that Mr. Trimmer received from retirement accounts but did not roll over into another qualified retirement account within 60 days; (2) whether petitioners are liable for the 10% additional tax under section 72(t); and (3) whether petitioners failed to report $40 of dividend income.[1]

## FINDINGS OF FACT

The parties have stipulated some facts, which we find and incorporate by this reference. Petitioners resided in New York when they petitioned this Court.

Petitioners have been married over 25 years and have two sons. Mrs. Trimmer has been a New York City school teacher at all relevant times. Mr. Trimmer served as a police officer with the New York Police Department (NYPD) for 20 years until his retirement on April 30, 2011, when he was 47 years old.

Before retiring from the NYPD Mr. Trimmer had secured a position as a security guard with the New York Stock Exchange to supplement his pension income from the NYPD and help finance his sons' college educations. Shortly after he retired from the NYPD, however, this new job fell through. He was

---

[1]All section references are to the Internal Revenue Code (Code) at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

unable to find another position immediately, and NYPD policy prevented a retired officer from returning to work there.

About three weeks after retiring Mr. Trimmer began experiencing symptoms of major depressive disorder. In a stark departure from his pre-retirement personality, he became antisocial, irritable, and uncommunicative with his wife and two sons. He rarely left his house. He had trouble sleeping, and he lost weight. He neglected his hygiene and grooming. He stopped coaching his sons' sporting events and stopped attending their school events, which he had previously attended without fail. Although he occasionally wrote checks from petitioners' joint checking account (generally at the request of his wife or sons), otherwise, as he testified, he "kind of just didn't do much of anything".

Mrs. Trimmer testified that during this time her husband was "like a lost soul", and when she came home from work in the evening she would often find him where she had left him in the morning. Looming financial pressures caused marital tension. Mr. Trimmer was so changed that Mrs. Trimmer came to believe that she could not depend on him to carry out tasks he had previously performed reliably. She felt that she needed to monitor Mr. Trimmer, so that she might offer encouragement or intervene to help him through events or activities.

Through his employment with the NYPD Mr. Trimmer had retirement accounts with the New York City Employees' Retirement System and the New York City Police Pension Fund (retirement accounts). On May 27 and June 10, 2011--after his major depression had set in--Mr. Trimmer received from his retirement accounts distribution checks for $99,990 and $1,680 (two distributions). These checks lay on his dresser at home for over a month until, on July 5, 2011, he deposited them into petitioners' joint bank account.

Although petitioners had conferred about Mr. Trimmer's retirement, Mrs. Trimmer did not know exactly what needed to be done and did not get involved in this matter; she assumed that he was handling his retirement. This was in keeping with petitioners' division of household duties: While Mrs. Trimmer handled many of the day-to-day bill-paying responsibilities for petitioners' family, Mr. Trimmer handled their "large-scale" investment decisions, such as planning for retirement and college savings.

Mr. Trimmer also customarily handled the family's taxes, collecting the necessary information, making an appointment with a tax return preparer, and eventually bringing the completed forms home for Mrs. Trimmer to sign. Before retiring, he would usually have petitioners' tax returns prepared early, usually in February, so that petitioners could receive any refund early.

In the spring of 2012, however, still suffering from depression, he had to be reminded repeatedly by Mrs. Trimmer to have their 2011 return prepared. Finally, as the due date for the return approached, Mr. Trimmer went to petitioners' regular tax return preparer to handle their 2011 taxes.

In early 2012 Mr. Trimmer had received Forms 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., reporting the two distributions with taxable amounts of $99,990 and $710 reported in boxes 2a. He gave these forms to the return preparer, who noticed that the Forms 1099-R for the two distributions indicated a distribution code of "1": "Early distribution, no known exception". The return preparer advised Mr. Trimmer to put the two distributions into an IRA.

On March 29, 2012, petitioners filed their 2011 Form 1040. They reported the two distributions as nontaxable.[2]

On April 16, 2012, acting upon his return preparer's advice, Mr. Trimmer opened an IRA at the same bank where petitioners had deposited the two distributions and immediately rolled the funds over to the new IRA. Between the

---

[2]They did not report a $40 dividend which they had received in 2011 on certain stock that Mr. Trimmer had bought, using his Social Security number, when his son was a newborn.

time Mr. Trimmer received the two distributions and the time he opened the IRA, petitioners did not make any use of the funds from the two distributions.

Gradually Mr. Trimmer's depression began to dissipate; by the summer of 2012 it was in remission.

On December 16, 2013, respondent issued to petitioners a Notice CP2000, Proposed Changes to Your 2011 Form 1040, asserting that petitioners had failed to report $100,700 of taxable retirement income from the two distributions; that they were liable under section 72(t) for an additional 10% tax on premature distributions from a qualified plan; and that they had failed to report $40 of taxable dividend income. The Notice CP2000 indicated that, because of these proposed changes, petitioners owed $39,963 in additional taxes. The Notice CP2000 advised petitioners that if they disagreed with the proposed changes, they should complete an attached response form and send it to the IRS by January 15, 2014; otherwise, the letter indicated, the IRS would send petitioners a notice of deficiency reflecting the proposed changes. Petitioners requested an extension, and by letter dated March 27, 2014, the IRS granted their request, extending the response date to April 23, 2014.

On April 30, 2014, Mr. Trimmer sent the IRS a letter which stated in its entirety:[3]

Dear Sirs:

I am contesting the amount of money said to be owed.  Please allow me to explain the situation.  In April 2011 I retired from my job and took a pension loan.  After my retirement I went through a period of depression and was not managing my affairs.  I received my check for the loan and deposited it into Santander bank on July 5, 2011.  The money remained in this account until April of 2012 when it was switched to an I.R.A. in the same bank where it remains to this day. A few points

- There was no deception or spending, investing of the money at all. I received the check and deposited it into the bank
- My wife and I have been paying taxes for a combined 60 years and NEVER had the least bit a problem.
- There was no harm done to anyone with the money staying in the bank except me (I was receiving 0.25% interest.)
- I switched the money to an I.R.A. before I was notified by the I.R.S.

I am now employed again and am driving a school bus and have a son in college and another a year away.  To pay $40,000 in taxes for

---

[3]The copy of the letter in the record is not dated, but respondent has stipulated its authenticity and has proposed as a finding of fact, unopposed by petitioners, that Mr. Trimmer sent the letter to respondent "[a]t some time after respondent issued the Notice CP2000 to petitioners".  Because, as described infra, respondent subsequently sent two letters to petitioners referencing their correspondence or response of April 30, 2014, and because the administrative record in evidence contains no other correspondence from petitioners that fits this description, we find that Mr. Trimmer sent his letter on April 30, 2014. Respondent has raised no issue about petitioners' response being late; we deem any such issue to be waived.

money that is in an I.R.A. would absolutely cripple my family as it would be 3 years of my salary. Sir no harm was done to anyone. I went through a rough time upon separation from my job, causing me emotional hard times that caused this situation. Penalizing me and my family would not benefit anybody, only cause extreme duress and punish my children who played no part in this situation. I ask you to consider these facts and please come to a fair decision. Please contact me if you need at [phone number redacted].

Thank You,
John Trimmer

By letter dated June 3, 2014, the operations manager of the IRS Andover, Massachusetts, Service Center thanked petitioners for their April 30, 2014, correspondence and stated: "You don't need to do anything else for now. We will contact you again within 60 days to let you know what action we are taking." Petitioners did not have to wait long, however, for by letter dated only three days later--June 6, 2014--the operations manager summarily denied petitioners' request for relief, stating only: "The law requires you to roll over your distribution within 60 days of the distribution date. If the roll over exceeds the time frame it becomes fully taxable." The letter did not mention respondent's statutory authority to grant hardship waivers or any procedure for applying for one; nor did it acknowledge Mr. Trimmer's particular circumstances as described in his letter. Much like the original Notice CP2000 to which petitioners had already responded, the operation manager's letter stated: "If you don't agree with our proposed changes, write to us

and tell us why." The letter further indicated that if the IRS had not heard further from petitioners by July 2, 2014, "we will continue to process the proposed changes to your return based on the information we currently have."

On August 18, 2014, the IRS issued a notice of deficiency reflecting the changes proposed in the Notice CP2000. Petitioners timely petitioned this Court.

## OPINION

### I.   Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners do not contend, and the evidence does not establish, that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

### II.   Taxability of IRA Distributions

#### A.   General Principles

Section 61(a) provides generally that "gross income means all income from whatever source derived". Section 402(a) provides that "any amount actually distributed to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to the distributee, in the taxable year of the distributee in which distributed, under section 72

(relating to annuities)." There is no dispute that the two distributions were actually made to Mr. Trimmer in 2011 from his retirement accounts, which were employees' trusts described in section 401(a).

Section 402(c)(1) excludes from gross income any portion of a distribution that is rolled over to an "eligible retirement plan" as defined in section 402(c)(8)(B). Section 402(c)(3)(A) provides: "Except as provided in subparagraph B", the rollover exclusion is not available for "any transfer of a distribution made after the 60th day following the day on which the distributee received the property distributed." Subparagraph B grants the Secretary the authority to waive the 60-day rollover requirement:

> Hardship exception.--The Secretary may waive the 60-day require-ment under subparagraph (A) where the failure to waive such requirement would be against equity or good conscience, including casualty, disaster, or other events beyond the reasonable control of the individual subject to such requirement.

Mr. Trimmer received the two distributions in the form of checks on May 27 and June 10, 2011. And on July 5, 2011, he deposited the checks into petitioners' joint bank account. The 60-day rollover periods ended July 26 and August 9, 2011, respectively.

B.     The Parties' Contentions

Petitioners do not dispute that Mr. Trimmer missed the 60-day deadline for rolling over the two distributions, but they contend that he qualifies for a hardship waiver under section 402(c)(3)(B) because his failure to make timely rollovers was caused by his major depressive disorder during the relevant period.

Respondent contends that the hardship waiver provision of section 402(c)(3)(B) is "inapplicable" because Mr. Trimmer failed to apply for relief pursuant to the terms of Rev. Proc. 2003-16, 2003-1 C.B. 359.  Respondent also contends that there has been no final administrative determination denying petitioners relief, and that even if there had been, it would not be subject to judicial review.[4]  Furthermore, respondent contends, there was no abuse of discretion in denying petitioners the requested waiver, because petitioners have failed to establish that Mr. Trimmer was unable to complete the rollovers within 60 days of the two distributions.  We address these arguments in turn.

C.     Authority To Consider Hardship Waiver Request During Examination

In Rev. Proc. 2003-16, supra, the IRS provided guidance about applying for hardship waivers under section 402(c)(3)(B).  Section 3.01 of Rev. Proc. 2003-16,

---

[4]Both before and after trial the Court encouraged the parties to explore further administrative consideration of petitioners' claim for a hardship waiver, but respondent declined.

2003-1 C.B. at 359, states that "a taxpayer must apply for a hardship exception" to the 60-day rollover requirement by submitting a request for a private letter ruling under the procedures outlined in Rev. Proc. 2003-4, 2003-1 C.B. 123, and include with the application the user fee set forth in Rev. Proc. 2003-8, 2003-1 C.B. 236.[5]

On August 24, 2016, the IRS issued Rev. Proc. 2016-47, 2016-37 I.R.B. 346, which authorizes "additional" hardship waivers during the examination of the taxpayer's return.[6]  It states:

SECTION 4.  ADDITIONAL WAIVERS DURING EXAM

In addition to automatic waivers and waivers through application to the IRS under Section 3 of Rev. Proc. 2003-16, the IRS, in the course

---

[5]Sec. 3.03 of Rev. Proc. 2003-16, 2003-1 C.B. 359, 360, also provides for "automatic approval" of a hardship waiver if the "taxpayer follows all procedures required by the financial institution for depositing the funds into an eligible retirement plan within the 60-day period * * * and, solely due to an error on the part of the financial institution, the funds are not deposited" within the 60-day period.  Taxpayers who qualify for "automatic approval" are not required to submit an application to the IRS. Id.  There is no dispute that the "automatic approval" procedures are inapplicable in the case before us.

[6]Rev. Proc. 2016-47, 2016-37 I.R.B. 346, also contains a new self-certification procedure that taxpayers can use to claim eligibility for a waiver from the rollover requirement.  This new procedure applies if a taxpayer misses the 60-day rollover deadline for any of 11 different reasons, including "the distribution, having been made in the form of a check, was misplaced and never cashed; * * * the distribution was deposited into and remained in an account that the taxpayer mistakenly thought was an eligible retirement plan; * * * [or] the taxpayer or a member of the taxpayer's family was seriously ill". Id. sec. 3.02, 2016-37 I.R.B. at 347.

of examining a taxpayer's individual income tax return, may determine that the taxpayer qualifies for a waiver of the 60-day rollover requirement under § 402(c)(3)(B) or 408(d)(3)(I). [Id. sec. 4, 2016-37 I.R.B. at 347.]

It also provides: "Rev. Proc. 2003-16 is modified by Section 4 of this revenue procedure." Id. sec. 6. Additionally, it states that it is effective on August 24, 2016. Id. sec. 5.[7]

Respondent's primary position is that the hardship waiver provisions of section 402(c)(3)(B) are "inapplicable" because petitioners failed to request a private letter ruling and pay the associated fee, pursuant to section 3.01 of Rev. Proc. 2003-16. Respondent contends that because Rev. Proc. 2016-47, supra, had not been issued as of the time when petitioners' 2011 return was under examination, "respondent's examination division did not have the authority to determine whether petitioners qualified for a waiver."

We are not persuaded. Nothing in Rev. Proc. 2003-16, supra, purports to limit or constrain an IRS examiner's ability to consider a hardship waiver during the course of an examination. Certainly no such constraint is found in section 402(c)(3)(B). Moreover, respondent's position appears to be at odds with Internal

---

[7]Rev. Proc. 2016-47, supra, was issued after the parties had filed their posttrial briefs. At the Court's direction, the parties filed legal memoranda providing their views as to the impact, if any, of that revenue procedure on this case.

Revenue Manual (IRM) pt. 4.10.7.4(2) (Jan. 1, 2006), which states: "Examiners are given the authority to recommend the proper disposition of all identified issues, as well as any issues raised by the taxpayer."

Consequently, the purpose and effect of the 2016 modification of Rev. Proc. 2003-16, supra, we believe, was not to create some new authority that had not previously existed for IRS examiners to consider hardship waivers during examinations, but rather to make clear the existence of that authority. This conclusion is reinforced by careful consideration of the substantive coordination between the two revenue procedures.

Section 1 of Rev. Proc. 2016-47, 2016-37 I.R.B. at 346, describes dual purposes, to "provide[] for a self-certification procedure" and to modify Rev. Proc. 2003-16, supra, "by providing that the Internal Revenue Service may grant a waiver during an examination". But these two purposes are accomplished in different ways. Whereas section 3 of Rev. Proc. 2016-47, 2016-37 I.R.B. at 347, provides for a new self-certification procedure, section 6 of Rev. Proc. 2016-47, rather than simply providing that the IRS may now grant waivers during examination, instead modifies Rev. Proc. 2003-16, supra, to include guidance about "Additional Waivers During Exam". Rev. Proc. 2016-47, supra, makes no modification to the Rev. Proc. 2003-16, supra, regarding the new self-certification

procedure. It would appear that the differing treatment of examination authorities and self-certification procedures was purposeful.[8]

Moreover, among the many unmodified provisions of Rev. Proc. 2003-16, supra, is section 4, which states that the revenue procedure "is effective on January 27, 2003." As of August 24, 2016, then, Rev. Proc. 2003-16, supra, contains the new provision for additional waivers during examination while also stating that Rev. Proc. 2003-16, supra, is effective as of January 27, 2003. The effect, we think, is to make clear retrospectively that the IRS has had the authority to grant waivers during the exam process at least since January 27, 2003, when Rev. Proc. 2003-16, supra, was first issued.

Furthermore, the examining agent's authority to consider a hardship waiver during the examination strongly implies, we believe, that the taxpayer may request the waiver. It would be anomalous if the examining agent could consider the relief only if the taxpayer had not requested it.[9]

_____

[8]If the IRS had intended the effective date on guidance for waivers during examination to be the same as the effective date for the self-certification procedure, there would have been no need for this carefully constructed difference between the ways these two pieces of guidance were implemented, i.e., there would have been no need to explain that the Rev. Proc. 2003-16, supra, is modified by sec. 4 of Rev. Proc. 2016-47.

[9]And as we noted above, the Internal Revenue Manual pt. 4.10.7.4(2) (Jan.

(continued...)

In fact, it was during the examination of petitioners' 2011 return that respondent, in the Notice CP2000, invited petitioners to respond to his proposal to treat the two distributions as immediately taxable. In response to this invitation Mr. Trimmer wrote the IRS requesting relief. As might be expected from a self-represented taxpayer unversed in the technicalities of the tax law, he did not expressly cite section 402(c)(3)(B). But his letter leaves little doubt that he was seeking a hardship waiver of the 60-day rollover requirement, stating among other things that he "went through a rough time upon separation from my job, causing me emotional hard times that caused this situation", describing the devastating financial effects on his family that would result from immediate taxation of the two distributions, and concluding with a plea for a "fair decision".

Notably, respondent's agent did not decline to consider Mr. Trimmer's request, did not request that petitioners provide any additional information, and did not advise them that they were required to submit a private letter ruling request or do anything else in particular to have their request considered. To the contrary, in her June 3, 2014, letter, respondent's agent advised petitioners, in response to

_____

[9](...continued)
1, 2006), states: "Examiners are given the authority to recommend the proper disposition of all identified issues, as well as any issues raised by the taxpayer." (Emphasis added.)

Mr. Trimmer's April 30, 2014, letter, that "[y]ou don't need to do anything else for now.  We will contact you again within 60 days to let you know what action we are taking."  Only three days later, on June 6, 2014, the agent wrote petitioners again, denying the requested relief, not on the basis that petitioners had requested it in the wrong manner or had provided insufficient information, but on the basis of cursory and incomplete legal analysis that failed to take into account the provision for hardship waivers under section 402(c)(3)(B).

Respondent points to several Memorandum Opinions in which this Court declined to consider equitable relief from the 60-day rollover requirement in circumstances where the taxpayer did not first request a waiver administratively from the IRS under section 408(d)(3)(I) (which provides, for IRA distributions, waiver authority analogous to that under section 402(c)(3)(B)).  See Dabney v. Commissioner, T.C. Memo. 2014-108; Bobrow v. Commissioner, T.C. Memo. 2014-21; Atkin v. Commissioner, T.C. Memo. 2008-93.  In none of theses cases, however, is there any indication that the taxpayer ever made any administrative request for a hardship waiver, through the private letter ruling process, during the examination, or otherwise.  In contrast, as just discussed, Mr. Trimmer did in fact request administrative relief from the 60-day rollover requirement during the

examination, and the IRS considered and rejected his request in processing the changes that are reflected in the notice of deficiency.

On brief respondent asserts that the agent's June 6, 2014, letter was not a "final determination" because it invited petitioners to "write and tell us why" if they disagreed with its conclusions. But this was essentially the same invitation contained in the Notice CP2000, issued December 16, 2013, in response to which Mr. Trimmer dutifully sent his April 30, 2014, letter describing the facts and circumstances upon which he based his request for relief. Considering that Mr. Trimmer's letter had resulted in the IRS' summarily denying his request on legal grounds that seemed to admit of no possibility of administrative relief, without even acknowledging the specific facts and circumstances spelled out in Mr. Trimmer's letter, the invitation for petitioners to respond yet again if they disagreed strikes us as an empty gesture or mere boilerplate.

Having considered all of respondent's arguments, we hold that respondent had the authority to consider Mr. Trimmer's hardship request during petitioners' examination, and we conclude that respondent did in fact make a final determination to deny the hardship waiver.

D.    Judicial Review of Hardship Waiver Denial

The timely filing of a petition in response to a notice of deficiency conferred jurisdiction on this Court in this proceeding.  See sec. 6213(a).  Nevertheless, respondent asserts, without meaningful analysis, that petitioners cannot "piggyback" on this Court's deficiency jurisdiction to obtain review of respondent's denial of the waiver.  The only authority respondent cites in support of this assertion is Bourekis v. Commissioner, 110 T.C. 20 (1998).  Respondent's reliance on Bourekis is misplaced.

Bourekis addresses this Court's jurisdiction to review a denial of a request for abatement of interest.  Under section 6404(h)(1), the jurisdictional prerequisite for such review is a "final determination" not to abate interest.  Bourekis v. Commissioner, 110 T.C. at 27; see Rule 280.  Bourekis held that the notice of deficiency did not constitute a final determination not to abate interest.  Bourekis v. Commissioner, 110 T.C. at 26-27.  Consequently, the Court lacked jurisdiction to consider the taxpayer's interest abatement claim.  Id.

In contrast, petitioners' claim for relief goes to the merits of the deficiency determination and under section 6213(a) does not require any "ticket" to the Tax Court apart from the notice of deficiency.  It is well established that this Court's deficiency jurisdiction includes reviewing administrative determinations that are

necessary to determine the merits of deficiency determinations.  See, e.g., Capitol

Fed. Sav. & Loan Ass'n v. Commissioner, 96 T.C. 204, 214-215 (1991) (holding

that the Commissioner's refusal to process an application for an accounting

method change under section 446(b) is subject to judicial review in a deficiency

proceeding); Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988) (holding that

the Commissioner's denial of a waiver of the addition to tax under former section

6661 is subject to judicial review in a deficiency proceeding); Estate of Gardner v.

Commissioner, 82 T.C. 989, 1000 (1984) (holding that the Commissioner's denial

of a request under section 6081(a) to extend the time for filing an estate tax return

is subject to judicial review in a deficiency proceeding).

There is a strong presumption that an act of administrative discretion is

subject to judicial review.  Corbalis v. Commissioner, 142 T.C. 46, 56 (2014)

(holding that denials of interest suspension under section 6404(h) are subject to

judicial review); Mailman v. Commissioner, 91 T.C. at 1082; Estate of Gardner v.

Commissioner, 82 T.C. at 994; see New York Racing Ass'n v. NLRB, 708 F.2d

46, 51 (2d Cir. 1983) ("[J]udicial review is the rule, and preclusion * * * the

exception[.]" (citing Barlow v. Collins, 397 U.S. 159, 166-67 (1970))).  "Agency

action is only exempt from judicial review where the governing statutes expressly

preclude review or where the action is committed to agency discretion by law."

Mailman v. Commissioner, 91 T.C. at 1082.[10]

Nothing in section 402(c)(3) expressly precludes judicial review, nor does the legislative history reveal any such congressional intent.[11] To the contrary, because the denial of a hardship waiver can affect directly the existence and amount of any asserted deficiency--as it does in this case--the procedures Congress has established for judicial review of the Commissioner's deficiency determinations logically contemplate review of such a denial as one element of the deficiency determination. See Estate of Gardner v. Commissioner, 82 T.C. at 996.

---

[10]Mailman v. Commissioner, 91 T.C. 1079, 1082 (1988), makes it clear that by "committed to agency discretion by law", the Court means "committed solely to agency discretion". Action is committed solely to agency discretion only in a "narrow category of circumstances", id. at 1083, which do not exist in this case, as discussed below.

[11]The conference committee report merely summarizes secs. 402(c)(3)(B) and 408(d)(3)(I) and then states:

> For example, the Secretary may issue guidance that includes objective standards for a waiver of the 60-day rollover period, such as waiving the rule due to military service in a combat zone or during a Presidentially declared disaster * * *, or for a period during which the participant has received payment in the form of a check, but has not cashed the check, or for errors committed by a financial institution, or in cases of inability to complete a rollover due to death, disability, hospitalization, incarceration, restrictions imposed by a foreign country, or postal error. [H.R. Conf. Rept. No. 107-84, at 252-253 (2001), 2001-3 C.B. 123, 375-376.]

"To determine whether an action has been committed solely to agency discretion we have followed the standards followed in other Federal courts." Mailman v. Commissioner, 91 T.C. at 1082. Courts have refrained from reviewing exercise of administrative discretion

> [o]nly in cases in which it can be found that the existence of broad discretionary power is not appropriate for judicial review, or that the agency determination involves political, economic, military, or other managerial choices not susceptible to judicial review, or that the agency determination requires experience or expertise for which legal education or the lawyer's skills provide no particular competence for resolution and for which there are no ascertainable standards against which the expertise can be measured. [Id. at 1082-1083.]

None of these circumstances exists here. We believe that there are ascertainable standards on which to base our review. We may look not only to the terms of section 402(c)(3)(B) but also to related provisions and the overall legislative purpose, as well as the objective factors set out in Rev. Proc. 2003-16, supra, for evaluating whether a hardship waiver should be granted. The review does not involve political, economic, military, or other managerial choices not susceptible to judicial review. See Estate of Gardner v. Commissioner, 82 T.C. at 997. And nothing suggests that the Commissioner's exercise of discretion to grant a rollover waiver involves any agency expertise beyond the competence of the courts. See id. at 998. Nor do we think that judicial review of the Commissioner's

denial of a hardship waiver from the rollover requirement will impair the Commissioner's ability to discharge congressionally mandated duties. As stated in Estate of Gardner: "Our review is part of an overall redetermination proceeding occurring only after respondent has completed his audit and administrative review and has issued his statutory notice of deficiency to the taxpayer. Such review is no more intrusive than our review of respondent's exercise of discretion under other provisions of the Code." Id.

Although the Court's jurisdiction is carefully circumscribed, "once our deficiency jurisdiction has been properly invoked, we will examine de novo the merits of respondent's deficiency determinations", including his exercise of discretion under section 402(c)(3)(B), inasmuch as the "alleged deficiency * * * turn[s] upon respondent's discretionary actions." Id. at 999.

For these reasons, we hold that we have jurisdiction to review respondent's denial of a hardship waiver to petitioners. We note that reviewing respondent's exercise of discretion is not contrary to our general policy of not looking behind a statutory notice of deficiency to examine respondent's motives or conduct in determining that deficiency. See id. at 1000 (citing Graham v. Commissioner, 82 T.C. 299, 308-309 (1984) (and cases cited threat)). Our review of respondent's exercise of discretion does not examine the method or procedure by which

respondent made his administrative determination of a deficiency. Rather, our review of respondent's denial of a hardship waiver in this case is necessary for us to determine the merits of respondent's substantive determination of a deficiency.

We conclude that the appropriate standard of review is whether respondent has abused his discretionary authority by exercising it arbitrarily, capriciously, or without sound basis in law or fact. See Mailman v. Commissioner, 91 T.C. at 1084 ("The standard of review most appropriate in the case of a failure to grant a waiver is * * * whether respondent abused his discretion."); Estate of Gardner v. Commissioner, 82 T.C. at 1000; see also Estate of Roski v. Commissioner, 128 T.C. 113, 127 (2007).

In Estate of Gardner v. Commissioner, 82 T.C. at 1000, this Court observed that "An initial automatic denial without considering the facts and circumstances * * * would constitute the very essence of arbitrary administrative action and an abuse of the discretion granted." Under this standard, we have little trouble concluding that the initial administrative denial of Mr. Trimmer's request was an abuse of discretion. In denying Mr. Trimmer's request for a hardship waiver, respondent's agent, proceeding on what appears to have been an incomplete understanding of the pertinent statutory provisions, failed to address or even

acknowledge any of the facts and circumstances Mr. Trimmer set forth in his letter.[12]

In his answering brief respondent contends that the Court cannot find any abuse of discretion because "no administrative determination was made, and therefore no abuse of discretion can be determined." As previously discussed, however, we have found that respondent's agent made a determination in her June 6, 2014, letter, to deny Mr. Trimmer's request for a hardship waiver. Respondent also contends that the Court cannot find any abuse of discretion because, apart from Mr. Trimmer's letter to the operations manager, there "was no documentation or information submitted to respondent to substantiate Mr. Trimmer's claim that he had depression during the relevant periods." As previously discussed, however, the record indicates that the operations manager never requested any such documentation or information. In this proceeding petitioners have presented credible evidence--including expert testimony--that Mr. Trimmer did in fact suffer major depressive disorder during the relevant period. Respondent complains that the expert report was not offered during the examination. But again, it was not requested during the examination, and petitioners were provided no opportunity to

_____

[12]Since we find respondent's determination to be an abuse of discretion, and in the absence of any reasoned determination by respondent, we address the merits of petitioners' request de novo. See infra part II.F.

offer such evidence during the examination.  Therefore, as part of our judicial review the expert report is properly considered in this proceeding if it is admissible.  This brings us to respondent's motion in limine.

E.  Respondent's Motion in Limine To Exclude Petitioners' Expert Testimony

The day before trial respondent filed a motion in limine, objecting to the admission of the expert testimony and report of Kiu (Kathy) Ho, which petitioners offered at trial.

Ms. Ho is a licensed master social worker (LMSW) in New York, a licensed clinical social worker (LCSW) in California, and a clinical professor of law and a supervising social worker at the Fordham University School of Law.  She opined that Mr. Trimmer suffered from major depressive disorder during portions of 2011 and 2012.  Petitioners offered Ms. Ho's testimony and report to support their argument that Mr. Trimmer is entitled to a waiver of the 60-day rollover requirement under section 402(c)(3)(B).  At trial Ms. Ho's report was marked as an exhibit and her testimony was heard solely as an offer of proof; the Court deferred ruling on respondent's motion in limine to allow the parties an opportunity to further address the matter in their posttrial briefs.  We now examine

respondent's various objections and determine whether this testimony is admissible. We conclude that it is admissible, for the reasons discussed below.

### 1. Admissibility

We conduct this proceeding in accordance with the Federal Rules of Evidence. See Interim Rule 143(a), United States Tax Court Press Release 4 (Mar. 28, 2016), www.ustaxcourt.gov/press/032816.pdf.[13] The proponent has the burden of showing that expert testimony meets the requirements of rule 702 of the Federal Rules of Evidence.[14] In re Pfizer Inc. Sec. Litig., 819 F.3d 642, 658 (2d Cir.

---

[13]Sec. 7453 was amended on December 18, 2015, to provide: "Except in the case of proceedings conducted under section 7436(c) or 7463, the proceedings of the Tax Court and its divisions shall be conducted * * * in accordance with the Federal Rules of Evidence." As a result of this amendment the Court follows the Federal Rules of Evidence as applied by the U.S. Court of Appeals to which a case is appealable. Battat v. Commissioner, 148 T.C. ___, ___ (slip op. at 20-21) (Feb. 2, 2017). Sec. 7453 as amended is effective for "proceedings commenced after the date of the enactment of this Act and, to the extent that it is just and practicable, to all proceedings pending on such date." Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, sec. 425(b), 129 Stat. at 3125. It is just and practicable to apply the Federal Rules of Evidence in this case, which was pending on December 18, 2015, and tried after that date.

[14]Fed. R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge

(continued...)

2016). This Court has a "gatekeeping" duty, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993), requiring us to determine that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand" before it may be admitted, id. The Court has broad discretion in carrying out this gatekeeping role, see In re Pfizer, 819 F.3d at 658; Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 85 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002), keeping in mind the "well-accepted principle that [r]ule 702 embodies a liberal standard of admissibility for expert opinions", Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005).

### a. Relevance

Rule 702(a) of the Federal Rules of Evidence requires that the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue". But the Supreme Court

---

[14](...continued)
will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

has explained that "[t]his condition goes primarily to relevance". Daubert, 509

U.S. at 591. Courts have therefore applied the principles of rule 401 of the

Federal Rules of Evidence to determine whether expert testimony is relevant to the

task at hand and thereby helpful. See, e.g., Amorgianos v. Nat'l R.R. Passenger

Corp., 303 F.3d 256, 265 (2d Cir. 2002). Evidence is relevant if "it has any

tendency to make a fact more or less probable than it would be without the

evidence; and the fact is of consequence in determining the action." Fed. R. Evid.

401.

One disputed issue is whether Mr. Trimmer was suffering from depression

during the relevant period. Ms. Ho's testimony undoubtedly tends to make that

fact more probable: Her testimony is that, on the basis of her extensive experience

and education, Mr. Trimmer's symptoms--as reported by petitioners and their

son--are consistent with a diagnosis of depression.

### b. Qualification of the Expert Witness

Having found Ms. Ho's testimony relevant, we turn to the requirement of

rule 702 of the Federal Rules of Evidence that the proposed expert be qualified by

knowledge, skill, experience, training, or education.

Ms. Ho is a candidate for a doctorate in social work at New York

University. She has a master's degree in social work from the University of

Southern California. She holds licenses as an LCSW in California and as an LMSW in New York.[15] She is also a clinical professor of law and supervising social worker at the Fordham University School of Law. Before her time at Fordham and New York University, Ms. Ho worked in a wide variety of clinical social work positions in California, where she participated regularly in assessing and treating patients.

After careful consideration of her experience, education, and licenses, we conclude that Ms. Ho is qualified to offer expert testimony on Mr. Trimmer's mental health history.[16]

---

[15]We note that "[l]icensure in the discipline or speciality which is the subject of expert opinion is not a requirement under the Federal Rules of Evidence". Doe v. Cutter Biological, Inc., 971 F.2d 375, 385 n.11 (9th Cir. 1992) (citing Geophysical Sys. Corp. v. Seismograph Serv. Corp., 738 F. Supp. 348 (C.D. Cal. 1990)). Ms. Ho's license as an LCSW in California, her lack of a license as an LCSW in New York, and her license as an LMSW in New York therefore do not necessarily resolve the issues of her qualification and helpfulness as an expert witness, though her certifications inform our determination.

[16]Moreover, while State practice is not binding on this Court on this issue, we note that California courts have admitted expert testimony of California LCSWs on psychological issues. See, e.g., People v. Gadlin, 78 Cal. App. 4th 587 (Ct. App. 2000). We are mindful that on at least one occasion a New York trial court disallowed expert testimony from an LMSW. See Five Boro Psychological Servs. v. GEICO Ins. Co., 929 N.Y.S.2d 199, 2011 WL 1879053 (Civ. Ct. 2011). But that court--after noting that "the lack of a medical licenses [sic] does not, in and of itself, disqualify a witness from testifying as an expert on a medical question"--decided that the putative expert did "not possess the combination of

(continued...)

c. Reliability

Finally, we consider whether Ms. Ho's testimony is reliable. In determining whether expert testimony is reliable, our inquiry is flexible, and our focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594-595. In addition to factors relating to reliability enumerated in rule 702 of the Federal Rules of Evidence, the Supreme Court has identified other factors we may consider but has not "set out a definitive checklist or test".[17] Daubert, 509 U.S. at 593. "[T]he types of factors that are appropriate to consider will depend upon the particular circumstances of the particular case at issue". In re Pfizer, 819 F.3d at 658 (internal quotation marks

---

[16](...continued)
long observation, real experience or sufficient education or training to be qualified as an expert on psychological testing." Id., 2011 WL 1879053, at *4. The putative expert in Five Boro had not given any psychological tests or conducted face-to-face psychological interviews for at least the prior 10 years. Id. Given Ms. Ho's license as an LCSW in California, her work in California in a clinical setting, and her educational background, the present case is easily distinguishable from Five Boro.

[17]The factors identified by the Supreme Court are: (1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has achieved "general acceptance" in the "relevant scientific community". Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-594 (1993); see Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).

and brackets omitted) (quoting <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999)). The inquiry "will necessarily vary from case to case". <u>Amorgianos</u>, 303 F.3d at 266.

Essentially, Ms. Ho's testimony consists of application of definitions and categories--found in the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5)--to the data she gathered from Mr. Trimmer and his family.[18]

Under rule 201 of the Federal Rules of Evidence this Court may take judicial notice of a fact that is not subject to reasonable dispute if it is generally known within our territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. We take judicial notice that the information contained in the DSM-5 that relates to this case, and the techniques of determining which definitions and categories apply to

---

[18]Respondent objects that, because the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5) was not attached to the expert report, it failed to comply with Rule 143(g)(1)(B), which requires that an expert report contain "the facts or data considered by the witness". We overrule respondent's objection for several reasons. First, the DSM-5 is not "facts or data" as contemplated by Rule 143(g)(1)(B). Rather, the DSM-5 is a reference manual published by the American Psychiatric Association that defines and classifies mental disorders. Also, petitioners' counsel provided copies of the relevant sections of the DSM-5 upon respondent's request. Finally, we take judicial notice of the contents of the DSM-5.

a particular person, are widely accepted in the scientific community, have been subjected to peer review and publication, and are subject to professional standards.[19] To be clear, we are not taking judicial notice of the reliability of the principles and methods themselves; rather, we take judicial notice of their wide acceptance and the existence of peer review and professional standards. On the basis of these judicially noticed facts, we conclude that the principles and methods are sufficiently reliable under rule 702 of the Federal Rules of Evidence.

To prepare her testimony, Ms. Ho directed her assistant to interview petitioners and their son and to research various issues. Ms. Ho also interviewed Mr. Trimmer personally to "gather more detail and to get clarifying information about his history". Ms. Ho considered various possible explanations for the symptoms described by petitioners and their son. Ms. Ho's assistant prepared a first draft of the expert report, which then went through multiple drafts. Upon review of Ms. Ho's credible testimony, we are satisfied that Ms. Ho provided careful supervision of her assistant's activities. It is clear that Ms. Ho took steps to verify the accuracy of the data that was gathered and actively participated in

---

[19]In O'Donnabhain v. Commissioner, 134 T.C. 34, 60 (2010), for example, we noted that all three experts who testified agreed that the fourth edition of the DSM (specifically, the 2000 text revision) was "the primary diagnostic tool of American psychiatry". The portions of the DSM-5 used by Ms. Ho are substantially identical to the DSM-4.

drafting the report; and nothing suggests that her approach deviated from the principles and methods referenced above. We therefore find that Ms. Ho reliably applied the aforementioned principles and methods to the facts and data.

Ms. Ho did not observe Mr. Trimmer's symptoms while they were occurring; she and her assistant interviewed petitioners and their son long after the symptoms had subsided. Respondent argues that Ms. Ho's retrospective assessment of Mr. Trimmer's condition is unreliable because she was not able to contemporaneously observe his symptoms. As petitioners observe, however, even if Ms. Ho had assessed his condition at the time Mr. Trimmer was experiencing symptoms, most or all of his symptoms would have been self-reported. Furthermore, as she gathered data and developed her opinion, Ms. Ho considered the possible effects of inaccurate memory or hindsight bias, and she also considered (and rejected) the possibility that Mr. Trimmer might be feigning or exaggerating symptoms. Finally, petitioners and their son were the sources for Ms. Ho's testimony, and all three testified. We were therefore able to directly judge the credibility of the sources of Ms. Ho's testimony, and we found all three to be highly credible. Moreover, their credible testimony corroborates the facts and data outlined in Ms. Ho's testimony. For all these reasons, after a thorough

review of the record, we find that Ms. Ho's testimony was based on sufficient facts and data.

On the basis of the foregoing analysis, we find that Ms. Ho's testimony meets the Daubert standard of reliability, and petitioners have met the burden that rule 702 of the Federal Rules of Evidence places on a proponent of expert evidence. We now turn to respondent's objections.

### 2.     State Law Concerns

Respondent asserts that Ms. Ho's report "reflects a violation of New York State law, and should not be entertained by the Court."[20] For the reasons explained below, we disagree.

First, some background. As part of a broader reworking of mental health services law, in 2002 New York enacted a new licensing regime for the practice of social work; it became effective in 2004. N.Y. Educ. Law secs. 7700-7713 (McKinney 2016). See generally People v. R.R., 807 N.Y.S.2d 516 (Sup. Ct. 2005). New York law licenses two levels of social work:  the practice of licensed

---

[20]Respondent appears to invoke the principle of comity, that is, the Federal Government's "proper respect for [S]tate functions", which requires that the Federal Government, when it carries out its functions and duties, "always endeavor[] to do so in ways that will not unduly interfere with the legitimate activities of the States." Younger v. Harris, 401 U.S. 37, 44 (1971); see Utilicorp United, Inc. v. Commissioner, 104 T.C. 670 (1995).

master social work and the practice of clinical social work. N.Y. Educ. Law sec. 7701. In general, an LCSW may practice the full range of social work, including diagnosis and treatment of mental illness, whereas an LMSW may perform many types of social work but must be supervised by an LCSW before she may diagnose or render treatment. Id.

Ms. Ho is an LMSW and not an LCSW under New York law. She was not supervised by an LCSW while preparing her testimony. Respondent argues that by preparing and submitting an expert report and then testifying, Ms. Ho has engaged in the unlawful practice of clinical social work without supervision and that therefore we should exclude her testimony. Because we find that Ms. Ho's testimony is not licensed clinical social work under New York law, we overrule respondent's objection.

The practices of licensed master social work and clinical social work are defined in N.Y. Educ. Law sec. 7701.[21] Respondent claims that Ms. Ho has

---

[21]N.Y. Educ. Law sec. 7701 (McKinney 2016) provides in part:

1. Practice of licensed master social work.

(a) The practice of licensed master social work shall mean the professional application of social work theory, principles, and the methods to prevent, assess, evaluate, formulate and implement a plan of action based on client needs and strengths, and intervene to address mental,

(continued...)

[21](...continued)
social, emotional, behavioral, developmental, and addictive disorders, conditions and disabilities, and of the psychosocial aspects of illness and injury experienced by individuals, couples, families, groups, communities, organizations, and society.
(b) Licensed master social workers engage in the administration of tests and measures of psychosocial functioning, social work advocacy, case management, counseling, consultation, research, administration and management, and teaching.

\*          \*          \*          \*          \*          \*          \*

2. Practice of clinical social work.

(a) The practice of clinical social work encompasses the scope of practice of licensed master social work and, in addition, includes the diagnosis of mental, emotional, behavioral, addictive and developmental disorders and disabilities and of the psychosocial aspects of illness, injury, disability and impairment undertaken within a psychosocial framework; administration and interpretation of tests and measures of psychosocial functioning; development and implementation of appropriate assessment-based treatment plans; and the provision of crisis oriented psychotherapy and brief, short-term and long-term psychotherapy and psychotherapeutic treatment to individuals, couples, families and groups, habilitation, psychoanalysis and behavior therapy; all undertaken for the purpose of preventing, assessing, treating, ameliorating and resolving psychosocial dysfunction with the goal of maintaining and enhancing the mental, emotional, behavioral, and social functioning and well-being of individuals, couples, families, small groups, organizations, communities and society.

(b) Diagnosis in the context of licensed clinical social work practice is the process of distinguishing, beyond general social work assessment, between similar mental, emotional, behavioral, developmental

(continued...)

diagnosed Mr. Trimmer and that therefore her activities come within the definition of clinical social work but not within the range of activities an LMSW can perform without supervision.

Diagnosis is a clinical social work activity that is expressly listed in the statute as "in addition" to the "scope of practice of licensed master social work". N.Y. Educ. Law sec. 7701.2(a). Yet the statute defines diagnosis as "the process of distinguishing, beyond general social work assessment, between similar mental, emotional, behavioral, developmental and addictive disorders, impairments and disabilities within a psychosocial framework on the basis of their similar and unique characteristics consistent with accepted classification systems". Id. subdiv. 2(b) (emphasis added). Also, the definition of licensed master social work includes "professional application of social work theory". Id. subdiv. 1(a). We are not convinced that Ms. Ho's testimony is "beyond general social work assessment" or anything other than "professional application of social work theory". We are aware of no case, regulation, or other authority that supports respondent's position.

_____

[21](...continued)
and addictive disorders, impairments and disabilities within a psycho-social framework on the basis of their similar and unique character-istics consistent with accepted classification systems.

Accordingly, we doubt that Ms. Ho's evaluation of Mr. Trimmer rises to the level of a "diagnosis" under New York State law; but even if it does, she did not thereby exceed her authority. As we discuss below, her evaluation was not clinical social work and was therefore permitted.

The statute defines clinical social work, as it exceeds the scope of licensed master social work, by listing those activities that an unsupervised LMSW may not perform; at the end of the list, this phrase appears: "[A]ll undertaken for the purpose of preventing, assessing, treating, ameliorating and resolving psychosocial dysfunction with the goal of maintaining and enhancing the mental, emotional, behavioral, and social functioning and well-being of individuals, couples, families, small groups, organizations, communities and society." Id. subdiv. 2(a). The word "all" indicates that the participle "undertaken" modifies every item on the list, including "diagnosis".

Ms. Ho did not evaluate Mr. Trimmer for the purpose of "preventing, assessing, treating, ameliorating and resolving" any dysfunction--Mr. Trimmer's depression was resolved by the time Ms. Ho saw him. She therefore could not have evaluated him for the purposes of preventing, treating, ameliorating, or resolving his illness, and as we noted above, an LMSW may undertake general social work assessment (by itself) without supervision. Additionally, the goal of

Ms. Ho's testimony had nothing to do with "maintaining and enhancing the mental, emotional, behavioral, and social functioning and well-being" of Mr. Trimmer (or anyone else).

For these reasons we conclude that Ms. Ho's examination of Mr. Trimmer, the compilation of her expert report, and her testimony in this case were not undertaken for the purposes stated in N.Y. Educ. Law sec. 7701.2(a) and therefore are not clinical social work. Consequently, Ms. Ho's examination of Mr. Trimmer, her expert report, and her testimony were not prohibited by New York law, and accordingly we overrule respondent's objection. See also Geophysical Sys. Corp. v. Seismograph Serv. Corp., 738 F. Supp. 348, 349 (C.D. Cal. 1990) ("[T]he rendering of an expert opinion in court is not the practice of a profession[.]").

### 3. Respondent's Remaining Objections

Respondent objects that Ms. Ho's report should be excluded under Rule 143(g)(2) because petitioners submitted it to the Court and served it on respondent 22 days before trial, instead of 30 days before as generally required under Rule 143(g)(2). We may, however, excuse untimeliness that is due to good cause and does not unduly prejudice the opposing party. Rule 143(g)(2).

Petitioners' counsel, a member of the Fordham Law School Clinic, represents that the lateness of the report was due to a variety of causes, including limitations and scheduling problems of an academic clinic. While we do not take missed deadlines lightly, upon due consideration of all the circumstances and the parties' arguments, we are satisfied there was good cause for the missed deadline.

Furthermore, respondent was not unduly prejudiced by the lateness of the report, which petitioners sent to respondent via email and overnight mail 22 days before trial. Respondent's counsel was able to prepare a thorough motion in limine detailing objections to the testimony. Respondent's counsel also ably argued her motion in limine and ably cross-examined Ms. Ho. Moreover, we reserved ruling on respondent's motion and allowed the parties to include arguments regarding the admissibility of Ms. Ho's testimony in their posttrial briefs. Finally, respondent's counsel has not outlined any measures, in addition to her motion and cross-examination, which she would have taken had she had an additional eight days. Respondent's objection is therefore overruled.

Respondent also contends that Ms. Ho's testimony must be excluded because the expert report fails to state the qualifications of her assistant, whose name and signature are on the report (along with Ms. Ho's name and signature). Respondent contends that "the true author" of the report was Ms. Ho's assistant

and that Rule 143(g)(1)(D) requires the expert report to state the qualifications not only of the testifying expert but also of any assistant who signs the report.

We overrule this objection for several reasons. First, the plain language of Rule 143(g)(1)(D) requires the report to contain only "the witness's qualifications". Second, an expert witness is "permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify". Dura Auto. Sys. of Ind., Inc. v. CTS Corp., 285 F.3d 609, 612 (7th Cir. 2002). Furthermore, rules 703 and 705 of the Federal Rules of Evidence govern the basis for an expert's opinion; rule 703 explicitly allows an expert to form her opinion on the basis of facts or data that the expert "has been made aware of". Finally, upon review of the record we are convinced that Ms. Ho's assistant did not "exercise professional judgment that is beyond the expert's ken". Dura Auto. Sys., 285 F.3d at 613. If she had, there might have been a question as to whether Ms. Ho was functioning as a mere "mouthpiece of a scientist in a different specialty". Id. at 614. But as it stands, nothing suggests that Ms. Ho's assistant functioned outside of Ms. Ho's area of expertise or outside of her supervision. Therefore, for all these reasons, respondent's objection is overruled.

Respondent also objects that Ms. Ho's report does not contain a statement of the compensation to be paid for her study and testimony, as required by Rule

143(g)(1)(F). But because Ms. Ho provided her services pro bono, there was no compensation for her to disclose. Respondent also objects that Ms. Ho's publications were not stated, as required by Rule 143(g)(1)(D). Respondent is mistaken; Ms. Ho's publications are listed on the curriculum vitae attached to her report. Respondent also objects that Ms. Ho's report does not include a list of all other cases in which she has testified as an expert during the previous four years, as required under Rule 143(g)(1)(E). But Ms. Ho has never testified as an expert before, so there was no prior testimony to disclose.

In sum, we overrule all of respondent's objections. Respondent's motion in limine will be denied and Ms. Ho's testimony admitted.

F.    Petitioners' Hardship Waiver

This brings us, finally, to the merits of petitioners' request for a hardship waiver. For the reader's convenience, we once again set out the relevant provision of section 402(c)(3)(B): "The Secretary may waive the 60-day requirement * * * where the failure to waive such requirement would be against equity or good conscience, including casualty, disaster, or other events beyond the reasonable control of the individual subject to such requirement."

The Code does not define the phrase "against equity or good conscience", and it appears nowhere else in the Code (except in section 408(d)(3)(I), which

provides identical waiver authority for the analogous 60-day deadline in the IRA distribution context). However, a very similar phrase, "against equity <u>and</u> good conscience" (emphasis added), appears in section 6654(e)(3)(A), which provides that no addition to tax for failure to pay estimated income tax shall be imposed if the Secretary determines that "by reason of casualty, disaster, or other unusual circumstances the imposition of such addition to tax would be against equity and good conscience". In <u>Meyer v. Commissioner</u>, T.C. Memo. 2003-12, the Court cited both section 6654(e)(3)(A) and (B) in waiving the section 6654(a) addition to tax because Mr. Meyer suffered from severe health problems; he had been diagnosed with HIV and AIDS, suffered a nervous breakdown, and had to take a leave of absence from his job. The Court is aware of no other cases explicating section 6654(e)(3)(A).

If we look outside the Code, the phrase "against equity or good conscience" or the more common phrase "against equity <u>and</u> good conscience", often appears in Federal statutes in contexts where the Government must decide whether a recovery of erroneously disbursed funds should be attempted. See Railroad Retirement Act of 1974, Pub. L. No. 93-445, sec. 10(c), 88 Stat. at 1344 (codified as amended at 45 U.S.C. sec. 231i(c) (2012)); Railroad Unemployment Insurance Act Amendments, ch. 842, sec. 11, 54 Stat. at 1096 (1940) (codified as amended at

45 U.S.C. sec. 352(d) (2012 & Supp. I 2013)) (all using the phrase "against equity or good conscience"); <u>see also</u> 5 U.S.C. secs. 5584(a), 8346(b), 8470(b) (2012); 10 U.S.C. secs. 1442, 1453(b)(2) (2012); 37 U.S.C. secs. 303a(e), 373(b) (2012); 38 U.S.C. sec. 5302(a) and (b) (2012); Intelligence Authorization Act for Fiscal Year 1993, Pub. L. No. 102-496, sec. 265, 106 Stat. at 3237-3238 (codified at 50 U.S.C. sec. 2095 (2012)); Social Security Amendments of 1967, Pub. L. No. 90-248, sec. 152(b), 81 Stat. at 861 (codified as amended at 42 U.S.C. sec. 404(b) (2012 & Supp. III 2015)); Social Security Amendments of 1965, Pub. L. No. 89-97, sec. 1870(c), 79 Stat. at 331 (codified as amended at 42 U.S.C. sec. 1395gg(c) (2012 & Supp. I 2013)) (all using the phrase "against equity and good conscience").

In <u>Groseclose v. Bowen</u>, 809 F.2d 502 (8th Cir. 1987), the court considered the meaning of "against equity and good conscience" as it appears in 42 U.S.C. sec. 404(b) (relating to adjustment or recovery of Federal old-age, survivors, and disability benefits). It observed that "the term 'equity denotes the spirit and habit of fairness and justness.'" <u>Groseclose</u>, 809 F.2d at 505 (quoting <u>Gilles v. Dep't of Human Res. Dev.</u>, 521 P.2d 110, 116 n.10 (Cal. 1974) (quoting Black's Law Dictionary 634 (4th ed. 1957)). It further observed that "[t]he term conscience means 'the sense of right or wrong * * * together with a feeling of obligation to do or be that which is recognized as good.'" <u>Id.</u> (quoting Webster's Third New

International Dictionary 482 (1981)).  The court noted that "against equity and good conscience" is "language of unusual generality", and that such broad language "necessarily anticipate[s] that the trier of fact, instead of attempting to channelize his decision with rigid and specific rules, will draw upon precepts of justice and morality as the basis for his ruling."  Id. (quoting Gilles, 521 P.2d at 116); see also Quinlivan v. Sullivan, 916 F.2d 524, 526-527 (9th Cir. 1990) (adopting the reasoning of Groseclose and concluding that in using the phrase "against equity and good conscience", with respect to waivers of overpayments of disability benefits, "Congress intended a broad concept of fairness to apply to waiver requests, one that reflects the ordinary meaning of the statutory language and takes into account the facts and circumstances of each case").

Similarly, section 402(c)(3)(B), like the legislative history and Rev. Proc. 2003-16, supra, signals that we should construe "equity or good conscience" to reflect a broad and flexible concept of fairness, by providing a nonexhaustive list of situations that might satisfy the general standard.[22]

_____

[22]Sec. 402(c)(3)(B), the accompanying conference committee report, and Rev. Proc. 2003-16, supra (which mirrors the statute and conference committee report in key respects) all describe circumstances that might support the granting of a hardship waiver as "including" certain circumstances and so do not necessarily foreclose other circumstances from the intended scope of relief.  See sec. 7701(c) ("The terms 'includes' and 'including' when used in a definition

(continued...)

Largely mirroring section 402(c)(3)(B) and the conference committee report, section 3.02 of Rev. Proc. 2003-16, 2003-1 C.B. at 359, states that the IRS will issue a ruling waiving the 60-day rollover requirement "in cases where the failure to waive such requirement would be against equity or good conscience, including casualty, disaster, or other events beyond the reasonable control of the taxpayer." It goes on to provide the following objective factors to be used in determining whether to grant a hardship waiver:

> In determining whether to grant a waiver, the Service will consider all relevant facts and circumstances, including: (1) errors committed by a financial institution * * *; (2) inability to complete a rollover due to death, disability, hospitalization, incarceration, restrictions imposed by a foreign country or postal error; (3) the use of the amount distributed (for example, in the case of payment by check, whether the check was cashed); and (4) the time elapsed since the distribution occurred.

Of these four factors, three present little difficulty in this case. The first factor is inapplicable--there was no error committed by any financial institution.

---

[22](...continued)
contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined."). Because we conclude that petitioners' circumstances are within the scope of enumerated situations, and therefore that they are entitled to relief, we need not and do not decide to what extent other circumstances might also qualify for hardship waivers.

The third and fourth factors are favorable to petitioners.[23] They never made any use of the amounts received in the two distributions other than to deposit them into a joint bank account, where they remained until petitioners rolled them over into an IRA. Petitioner's profited in no meaningful way from retaining the funds in their joint bank account during the interim.[24] Moreover, when petitioners' tax preparer alerted Mr. Trimmer to the rollover problem, Mr. Trimmer completed the rollover very soon thereafter.

The remaining factor, "inability to complete a rollover due to * * * disability", Rev. Proc. 2003-16, sec. 3.02, requires more extended analysis. We have found that Mr. Trimmer suffered from major depressive disorder, which commenced approximately three weeks after his retirement on April 30, 2011, and persisted until the summer of 2012. Mr. Trimmer's depression caused a marked change in activity level and sleep patterns. He left his home infrequently and

[23]On brief respondent ignores these two factors, presumably because they are favorable to petitioners. Whether we regard respondent's failure to address these factors as a concession in this regard or simply as a misapplication of an IRS revenue procedure makes little difference to our analysis.

[24]Although we are mindful that in some respects depositing a check into a bank account might be considered equivalent to cashing the check, we do not believe that by simply depositing the check into their bank account, without making any further use of the funds, petitioners made significant "use of the amount distributed" within the meaning of Rev. Proc. 2003-16, sec. 3.02, 2003-1 C.B. at 360.

experienced difficulty interacting with other people. He was so changed during this period that Mrs. Trimmer came to believe that she could not depend on him to carry out tasks he had previously and reliably performed. She felt that she needed to monitor him, so that she might offer encouragement or intervene to help him through events or activities. On the basis of all the evidence in the record, we conclude that Mr. Trimmer's major depressive disorder constituted a disability throughout the relevant period for the purposes of section 402(c)(3)(B) in that it significantly impaired his ability to perform day-to-day activities.[25]

We further conclude, on the basis of all the evidence in the record, that Mr. Trimmer's failure to meet the 60-day rollover requirement was attributable to his disability. Cf. Meyer v. Commissioner, T.C. Memo. 2003-12. All the evidence indicates that his depression set in after he requested that amounts be disbursed from his retirement accounts but before he received the first of the two

---

[25]We note that the new self-certification procedures apply to situations, among others, where "the taxpayer or a member of the taxpayer's family was seriously ill" without reference to "disability". Rev. Proc. 2016-47, sec. 3.02(2)(f). Although the self-certification procedures are inapplicable in this case, it would appear that the "seriously ill" standard of Rev. Proc. 2016-47, supra, should inform the "disability" standard of Rev. Proc. 2003-16, supra, since both are addressed to the identical "equity or good conscience" standard of sec. 402(c)(3)(B). Just as the "seriously ill" standard does not connote complete and total incapacitation, neither does the "disability" standard of Rev. Proc. 2003-16, supra.

disbursement checks in the mail on May 27, 2011.  Mr. Trimmer's illness then persisted for approximately a year, lingering until the summer of 2012.  Mr. Trimmer was therefore depressed throughout the relevant period.  Moreover, the same facts which led us to conclude that Mr. Trimmer suffered from a disability for the purposes of section 402(c)(3)(B) also lead us to conclude that his illness significantly impaired his ability to perform the necessary rollover.[26]

In sum, considering all the facts and circumstances, we conclude that Mr. Trimmer meets the objective factors for a hardship waiver as set forth in Rev. Proc. 2003-16, supra.

---

[26]In reaching this conclusion we are mindful that, as respondent points out, Mr. Trimmer was not totally inactive during the relevant period--he wrote some checks at the behest of his wife and sons, and he deposited the checks from the two distributions into the bank before the rollover period had expired.  We are not persuaded, however, that the fact that Mr. Trimmer was able to perform these relatively routine tasks, generally at the prompting of family members, meant that he was also capable of initiating and carrying out the more involved process of identifying another eligible retirement plan into which to roll over the funds and ultimately setting up an IRA in which to deposit the checks.  If anything, the fact that he left two checks totaling over $100,000 on his dresser at home for over a month before depositing them in the bank vividly evidences his impaired mental condition.  And although on cross-examination respondent elicited from Mr. Trimmer a "Yes" in response to a question whether he had worked part time as a high school referee "during 2011 and 2012", on the basis of all the evidence in the record and general life experience we do not believe that Mr. Trimmer was refereeing high school basketball games during the summer of 2011 or at any other relevant time.

Finally, although private letter rulings have no precedential effect, <u>see</u> sec. 6110(k)(3), and taxpayers are not entitled to rely upon private letter rulings not specifically issued to them, private letter rulings may be instructive insofar as they "reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws", <u>Hanover Bank v. Commissioner</u>, 369 U.S. 672, 686 (1962).[27] We have examined the Commissioner's private letter rulings to understand his customary construction of section 402(c)(3)(B) in administering the tax laws, and we have not found any espousing an interpretation of section 402(c)(3)(B)--or the identical provision of section 408(d)(3)(I)--that is inconsistent with granting a waiver in Mr. Trimmer's case; in fact, the Commissioner has granted waivers in circumstances similar to Mr. Trimmer's.[28] We conclude that granting petitioners a waiver is consistent with the

---

[27]<u>See also</u> <u>Thom v. United States</u>, 283 F.3d 939, 943 n.6 (8th Cir. 2002); <u>Wells Fargo & Co. & Subs. v. Commissioner</u>, 224 F.3d 874, 886 (8th Cir. 2000), <u>aff'g in part, rev'g in part</u> <u>Norwest Corp. v. Commissioner</u>, 112 T.C. 89 (1999); <u>Transco Expl. Co. v. Commissioner</u>, 949 F.2d 837, 840 (5th Cir. 1992), <u>aff'g</u> 95 T.C. 373 (1990); <u>Estate of Cristofani v. Commissioner</u>, 97 T.C. 74, 84 n.5 (1991); <u>Woods Inv. Co. v. Commissioner</u>, 85 T.C. 274, 281 n.15 (1985).

[28]<u>See, e.g.</u>, Priv. Ltr. Rul. 201535029 (Aug. 28, 2015) (waiver granted to taxpayer suffering from "mild cognitive impairment and moderate clinical depression", who was "not aware that he did not roll over Amount 1 to another IRA until his tax return for 2013 was being prepared"); Priv. Ltr. Rul. 201323044 (June 7, 2013) (waiver granted to taxpayer who was "under extreme stress

(continued...)

construction of section 402(c)(3)(B) that the Commissioner has employed in administering this provision over many years.

For the reasons discussed above, we conclude and hold that in the unique facts and circumstances of this case, pursuant to section 402(c)(3)(B) it would be against equity or good conscience to deny petitioners a waiver of the 60-day rollover requirement. Accordingly, we do not sustain respondent's determination to treat the two distributions as immediately taxable.

III.    Additional Tax on Early Distribution

Respondent determined in the notice of deficiency that petitioners are liable for the additional tax under section 72(t), which is equal to 10% of the portion of an early distribution which is includible in gross income. We have held that no portion of the two distributions is included in petitioners' 2011 gross income. Accordingly, the section 72(t) additional tax is inapplicable.

---

[28](...continued)
following the loss of his job"); Priv. Ltr. Rul. 201130013 (July 29, 2011) (waiver granted to taxpayer who asserted that failure to complete the rollover was "due to his depressed condition following his separation from his spouse"); Priv. Ltr. Rul. 200949052 (Dec. 4, 2009) (waiver granted to taxpayer who was "overwhelmed by his mother's death and sank into a deep depression during his period of grieving").

IV.   Dividend Income

In the notice of deficiency respondent determined that petitioners had unreported dividend income of $40, as reported on a Form 1099-DIV, Dividends and Distributions.  Petitioners did not assign error to this determination in their petition as required by Rule 34(b)(4) and have not addressed this issue in any meaningful way on brief, other than to assert generalized objections to respondent's proposed findings of fact in this regard.  We deem petitioners to have waived or conceded this issue.

In any event, at trial Mr. Trimmer acknowledged that he had purchased the stock using his Social Security number.  His testimony suggested that his original intention had been to hold the stock only as a nominee for his then-newborn son, who had not yet received a Social Security number.  But petitioners offered no evidence to support a finding that in 2011 the stock was owned by anyone other than Mr. Trimmer or that the dividend income belonged to, or was constructively received by, anyone other than Mr. Trimmer.

We therefore sustain respondent's determination that the $40 of unreported dividend income is includible in petitioners' 2011 taxable income.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered under Rule 155.